# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW MEXICO CATTLE GROWERS' ASSOCIATION<br>2231 Rio Grande Blvd. NW<br>Albuquerque, NM 87104 | Civil Action Case No. 1:21-cv-3263 |
| Plaintiff, | |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE<br>1849 C Street, N.W.<br>Washington, DC 20240 | |
| UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, N.W.<br>Washington, DC 20240 | |
| DEBRA HAALAND, in her official capacity as Secretary of the Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240 | |
| MARTHA WILLIAMS, in her official capacity as Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service<br>1849 C Street, N.W.<br>Washington, DC 20240 | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiff New Mexico Cattle Growers' Association's (Cattle Growers) membership is comprised of the hard-working individuals and families who earn their livelihoods raising cattle. Cattle Growers' membership includes the McKeen family, who for generations have raised cattle on the rugged terrain of western New Mexico. Ranching families like the McKeens must contend with drought, wildfire, and the many other realities of raising cattle in the harsh conditions of the arid west. They must also contend with burdensome federal regulations such as those imposed by the Defendants (collectively the "Service"), under the Endangered Species Act (ESA).

2.      ESA regulations impose significant burdens on ordinary land use. They increase the costs of federal permitting, reduce the market value of affected lands, and expose landowners to potentially ruinous civil and even criminal penalties. It is therefore crucially important that federal decisionmakers are guided by sound data-driven science and objective, publicly disclosed standards. Yet, in many instances the Service is guided by no such standards when making key decisions that impact landowners. For example, when determining whether a population constitutes a "subspecies" (making it eligible for listing under the ESA), the Service relies upon ad-hoc determinations, without resort to any definition or standard for identifying "subspecies." This leaves ranching families like the McKeens—who have had their property values and livelihoods harmed by the endangered subspecies listing of the southwestern willow flycatcher— with little choice other than to comply with arbitrary and unsupported regulations.

3.      In 2015—on behalf of affected members like the McKeen family—Cattle Growers, along with other groups, petitioned the Service to remove the southwestern willow flycatcher from the federal list of threatened and endangered species. *See* Petition of the Center for Environmental Science, Accuracy, and Reliability et al. to Remove the "Southwestern" Willow Flycatcher From

the List of Endangered Species Under the Endangered Species Act Due to Significant New Data that Demonstrates Original Data Error, Fed. Doc. No. FWS-R2-ES-2016-0039-0002, at 9 (Aug. 19, 2015) (the "Petition"). The grounds for the Petition were that, among other things, the best scientific and commercial data prove the flycatcher is not a distinct subspecies and is therefore ineligible for listing under the ESA.

4.      The Service denied the Petition, determining in relevant part that the southwestern willow flycatcher is a subspecies. *See* 82 Fed. Reg. 61,725 (Dec. 29, 2017) (the "Final Rule"). That denial was illegal. In denying the Petition the Service violated the fundamental administrative law principle of reasoned decision-making. It set forth no definition of "subspecies;" provided no governing criteria for determining whether any given population or group of populations qualifies as a subspecies; and ignored crucial scientific evidence bearing on the flycatcher's subspecies designation.

5.      Therefore, the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the Endangered Species Act, 16 U.S.C. §§ 1531–1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The Final Rule should be vacated, and the matter remanded to the Service.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); 16 U.S.C. § 1540(c) and (g) (actions arising under the ESA); 5 U.S.C. § 702 (providing for judicial review of agency action under the APA); 5 U.S.C. § 706 (authorizing courts to set aside unlawful agency action).

7.    On April 13, 2020, more than 60 days before the filing of this complaint, Cattle Growers provided the Secretary of the Interior and the Director of the United States Fish and Wildlife Service with written notice of the violations that are the subject of this lawsuit, in accordance with 16 U.S.C. § 1540(g)(2)(C). The notice is attached as Exhibit 1 and is incorporated herein by reference. Neither the Secretary nor the Director have responded to this notice or taken any action to withdraw the Final Rule at issue here or otherwise remedy the violations of law identified therein.

8.    Cattle Growers seeks relief under 28 U.S.C. § 2201 (authorizing declaratory relief) and § 2202 (authorizing injunctive relief).

9.    Cattle Growers asserts that the Service's denial of the Petition constitutes unlawful, arbitrary and capricious agency action. An actual, justiciable controversy now exists between Cattle Growers and the Service.

10.    The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

11.    Cattle Growers has exhausted all available administrative remedies.

12.    Cattle Growers is injured by the denial of the Petition. Invalidation of the Final Rule denying the Petition will redress those injuries.

13.    Venue in the District of the District of Columbia is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e), because Defendants are agencies and officers of the United States, Defendants reside in the District of the District of Columbia, and a substantial part of the events or omissions giving rise to the claim occurred in the District of the District of Columbia.

## DESCRIPTION OF PARTIES AND STANDING ALLEGATIONS

### Plaintiff

14.    **New Mexico Cattle Growers' Association** is a nonprofit organization that represents roughly 1,400 ranchers and landowners throughout 32 New Mexico counties and 19 states. Since 1914, its primary purpose has been to serve as an advocate for New Mexico ranchers and landowners and to protect ranching from a variety of threats, including overreaching environmental regulation.

15.    Leadership and committee positions are open to all Cattle Growers members. Although Cattle Growers represents the interests of all New Mexico ranchers, an annual fee is required for membership.

16.    Many of Cattle Growers' members have been, and continue to be, burdened by onerous environmental regulations. These include regulations imposed under the ESA, such as the flycatcher's endangered listing. Cattle Growers therefore devotes substantial resources to ensuring that ESA regulations are consistently and transparently imposed.

17.    Acting on behalf of its membership, Cattle Growers—through its elected leadership and various committees—acts as an advocate on ESA issues, publishes information on related issues for members, performs research pertaining to ESA regulation, submits comments to government agencies addressing concerns about how regulations under the ESA affect members, and engages in litigation when members are threatened by illegal government action taken under the ESA. For example, Cattle Growers has been involved in prior litigation over the flycatcher's critical habitat, *see N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Service*, 248 F.3d 1277, 1285 (10th Cir. 2001), and remains actively involved in current debates regarding the gray wolf.

18.     The Service's illegal denial of the Petition to delist the southwestern willow flycatcher under the ESA frustrates Cattle Growers' objectives and forces Cattle Growers to expend additional resources advocating for and educating its affected members. As the representative of New Mexico ranchers, Cattle Growers, through this lawsuit, seeks to protect its members' interests germane to its purpose.

19.     Cattle Growers' members would have standing to challenge the Final Rule in their own right but their participation is not required for this lawsuit. Cattle Growers' annual dues-paying membership includes New Mexico rancher and landowner Mr. Hugh McKeen, whose property overlaps with the flycatcher's critical habitat, and whose livelihood, property values, and property rights are threatened by the flycatcher's listing. On behalf of affected members like Hugh McKeen, Cattle Growers joined the Petition.

20.     Mr. McKeen owns a 700-acre private cattle ranch in Catron County, New Mexico. Mr. McKeen also holds permitted grazing rights on the adjacent 11,467-acre Cedar Breaks Allotment within the Gila National Forest, and adjudicated water rights from existing wells and ditches diverted from the San Francisco River. Mr. McKeen's ranch and grazing allotment overlap substantially with designated critical habitat for the flycatcher within the San Francisco Management Unit. *See* 78 Fed. Reg. 344, 378, 529 (Jan. 3, 2013).

21.     The listing and designation impose significant regulatory burdens on the use of Mr. McKeen's ranch property and adjoining grazing allotment. The direct effect of these regulatory burdens has been a substantial diminution in the appraised value of Mr. McKeen's ranch.

22.     The listing and critical habitat designation also subject Mr. McKeen to the risk of citizen suits and agency enforcement actions under the ESA, further adding to his operational costs.

23.     The designation has also led to additional reductions in the market value of Mr. McKeen's property, due to public perceptions of the burdens imposed by endangered species regulations.

24.     These economic injuries are traceable to the designation of critical habitat for the flycatcher and thus to the Final Rule denying the Petition to delist the flycatcher. Setting aside that illegal denial will redress these injuries by requiring the Service to properly consider the information contained in the Petition and revisit the propriety of the flycatcher's listing.

## **Defendants**

25.     The ***United States Fish and Wildlife Service*** is an agency of the Department of the Interior. The Service has been delegated responsibility by the Secretary of the Interior for the day-to-day administration of the ESA with respect to most terrestrial and freshwater plant and animal species. This includes listing species and  designating critical habitat. The Service's Final Rule denying the Petition to delist the southwestern willow flycatcher is the subject of this action.

26.     The ***United States Department of the Interior*** is an agency of the United States that administers and implements the ESA with respect to most terrestrial and freshwater plant and animal species. This includes listing species and designating critical habitat. The Department's Final Rule denying the Petition to delist the southwestern willow flycatcher is the subject of this action.

27.     ***Debra Haaland*** is the Secretary of the United States Department of the Interior. In that capacity Secretary Haaland is responsible for the administration of the ESA with respect to most terrestrial and freshwater plant and animal species. She is sued in her official capacity.

28.     **Martha Williams** is the Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service. In that capacity, Acting Director Williams oversees the Fish and Wildlife Service's administration of the ESA. She is sued in her official capacity.

## LEGAL BACKGROUND

### The Endangered Species Act

*Listing of Threatened or Endangered Species*

29.     To receive protection under the Endangered Species Act, a "species" must be determined to be "endangered" or "threatened," based on certain factors. *See* 16 U.S.C. § 1533(a). A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

30.     The ESA does not define the term "subspecies." *See id.* § 1532.

31.     A species or subspecies is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species or subspecies is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

32.     To be listed under the ESA, a bird must be either a threatened or endangered species, subspecies, or distinct population segment.

33.     The ESA forbids the unpermitted "take" of any endangered species of fish or wildlife. *See id.* § 1538(a)(1)(B). The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). The term "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding,

feeding or sheltering." 50 C.F.R. § 17.3. The ESA imposes harsh civil and criminal penalties for violation of its take prohibition. 16 U.S.C. § 1540(a)–(b).

34.     The ESA provides for citizen enforcement of the Act. 16 U.S.C. § 1540(g).

***Critical Habitat Designation***

35.     Generally, concurrent with a species' listing the Service must designate "critical habitat." 16 U.S.C. § 1533(a)(3).

36.     Such habitat comprises those occupied areas containing the physical or biological features essential to the species' conservation, or any unoccupied area that is itself "essential for the conservation of the species." *See id*. § 1532(5).

37.     Critical habitat designations negatively affect property owners by increasing the burdens of federal permitting, reducing the value of designated property, and increasing potential take liability.

***Consultation***

38.     Whenever an agency proposes to issue a permit, fund, or carry out an activity that may "jeopardize" a listed species' "continued existence" or will "result in the destruction or adverse modification of [its critical] habitat," the agency must "consult" with the Service over those effects and identify modifications or mitigation measures to ensure that the activity will not jeopardize the species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).

39.     This consultation requirement applies to activities on both private and public land.

40.     In practice, the result of consultation under the ESA is almost always the imposition of additional restrictions on the federally funded or permitted activity.

*Petitions to list or delist a species*

41.     The APA authorizes interested parties to petition for the enactment or repeal of any administrative rule. 5 U.S.C. § 553(e).

42.     The ESA requires the Service, to the maximum extent practicable, within 90 days of the receipt of such a petition seeking the listing or delisting of a species, to determine whether the petitioned action may be warranted. *See* 16 U.S.C. § 1533(b)(3)(A). Within one year of the petition's receipt, the Service must make a final determination as to whether the petitioned action is warranted. *Id*. § 1533(b)(3)(B). If the Service so determines, it must then proceed with rulemaking. *See id.* § 1533(b)(5).

43.     The Service has a nondiscretionary duty to list and delist species in accordance with Section 4 of the Act. *Id*. §§ 1533; 1540(g)(1)(C).

## Administrative Procedure Act

44.     The Administrative Procedure Act provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

45.     Pursuant to the APA, a court must set aside agency action that fails to meet statutory, procedural, or constitutional requirements; or is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)–(D).

## FACTUAL ALLEGATIONS

## The Service's Listing of the Flycatcher as a "Subspecies"

46.     In 1995, the Service listed the southwestern willow flycatcher as an endangered subspecies. 60 Fed. Reg. 10,694 (Feb. 27, 1995). The Service most recently designated 1,227

stream miles and 208,973 acres of revised critical habitat for the flycatcher in 2013. 78 Fed. Reg. 344 (Jan. 3, 2013).

47.     The flycatcher is a small, neotropical migrant bird that, during its breeding season of May to September, can be found in riparian habitats of the southwestern United States. 82 Fed. Reg. 61,725, 61,727 (Dec. 29, 2017). These include parts of California, Nevada, Utah, Colorado, Arizona, New Mexico, and Texas. *Id.* The bird has a "grayish-green back and wings, whitish throat, light grey-olive breast, and pale yellowish belly." 60 Fed. Reg. at 10,694.

48.     The Service considers the southwestern willow flycatcher (*Empidonax trailli extimus*) to be a subspecies of the widely distributed willow flycatcher (*Empidonax trailli*). *Empidonax trailli* is a common species with a range that spans the North American continent. *Empidonax trailli* is not threatened or endangered and meets none of the criteria for listing as either threatened or endangered under the ESA.

49.     The Service's original subspecies designation for the flycatcher was based on "subtle differences in color and morphology." 60 Fed. Reg. at 10,696.

50.     More recently, the Service has relied on morphological (coloration) data derived from "core" areas within the putative subspecies, *see* E.H. Paxton et al., *Geographic Variation in the Plumage Coloration of Willow Flycatchers Empidonax Traillii*, 41. J. Avian Biology 128 (2010) (Paxton et al. (2010)), on vocalization data similarly collected in areas that did not correspond to areas of geographic division, J.A. Sedgwick, *Geographic Variation in the Song of Willow Flycatchers: Differentiation Between Empidonax traillii adastus and E. t. extimus*, 118 The Auk 366 (2001) (Sedgwick 2001), and on patterns of genetic differentiation among putative flycatcher subspecies that nevertheless lack clear and distinctive geographic boundary lines, E.H. Paxton et al., *Using Molecular Genetic Markers to Resolve a Subspecies Boundary: The Northern*

*Boundary of the Southwestern Willow Flycatcher in the Four-corner States*, U.S. Geological Survey Open-File Report 2008-1117 (2008) (Paxton et al. (2008)).

### The Absence of any Regulatory Definition of "Subspecies"

51.     The Service has never promulgated a rule defining the term "subspecies."

52.     Most recently, on November 10, 2021, the Service denied a 2017 petition requesting that the Service promulgate a regulatory definition of the term "subspecies." In denying that petition the Service maintained its commitment to leaving that term undefined.

53.     The Service has promulgated other rules for defining important ESA terms. For example, in 1996, the Service defined "distinct population segment" and stated that "it is important that the term 'distinct population segment' be interpreted in a clear and consistent fashion" because "[a]vailable scientific information provides little specific enlightenment in interpreting the phrase." 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996).

54.     Like the term "distinct population segment," there is little scientific information available to interpret the term "subspecies," even among taxonomists. *See* Holly Doremus, *Listing Decisions Under the Endangered Species Act: Why Better Science Isn't Always Better Policy*, 75 Wash. U. L.Q. 1029, 1100–01 (1997).

### Zink (2015) and Shortcomings in the Service's Subspecies Determination for the Southwestern Willow Flycatcher

55.     Shortcomings in the current subspecies designation of the southwestern willow flycatcher were demonstrated in a 2015 study which reanalyzed many of the sources relied upon by the Service. *See* Robert M. Zink, *Genetics, Morphology, and Ecological Niche Modelling Do Not Support the Subspecies Status of the Endangered Southwestern Willow Flycatcher (Empidonax trailli extimus)*, 117 The Condor 76 (2015) (Zink 2015).

56.     Zink (2015) reanalyzed the molecular-genetic data from Paxton et al. (2008) and the morphological (coloration) data from Paxton et al. (2010). The study also refuted the vocalization data in Sedgwick (2001) and examined the ecological distinctiveness of the flycatcher through niche modelling techniques.

57.     Zink (2015) demonstrated that there exists no statistically valid morphological, genetic, vocal, or ecological basis for designating the flycatcher as a separate subspecies.

58.     Zink (2015) further highlighted the error in the Service's reliance on confirmatory studies, such as Sedgwick (2001), Paxton et al. (2008), and Paxton et al. (2010), which validate rather than test existing putative flycatcher subspecies. Zink (2015), *supra*, at 79. In particular, Zink (2015) demonstrated that these studies have not shown whether distinctions among existing flycatcher subspecies are any more significant than differences among randomly divided flycatcher populations. After studying this question, Zink (2015) concluded that, when viewed species wide, there is no significant genetic or morphological variation in flycatchers that corresponds to existing subspecies divisions (or any other geographically based division). *Id.* at 80–82.

## Cattle Growers' Petition to Delist the Flycatcher

### *The Petition*

59.     In August 2015, a coalition of interested groups, including Cattle Growers, submitted a delisting petition for the southwestern willow flycatcher for—among other things— taxonomic error. *See* Petition, *supra*, at 10.

60.     The Petition relied in part on Zink (2015) and demonstrated that morphological, genetic, vocal, and ecological data do not support the subspecies designation for the flycatcher.

13

61.     Initially, the Service made a positive determination, finding that the Petition presented substantial information indicating that delisting of the flycatcher may be warranted because the bird did not constitute a subspecies. *See* 81 Fed. Reg. 14,058, 14,070 (Mar. 16, 2016).

**Zink (2017)**

62.     Following submission of the Petition, another critical study was published. *See* Robert M. Zink, *Current Topics in Avian Conservation Genetics With Special Reference to the Southwestern Willow Flycatcher*, 9 The Open Ornithology J. 60 (2016) (Zink 2017).[1]

63.     Zink (2017) expanded on the analysis of Zink (2015) and contained three key pieces of additional genetic information demonstrating the erroneous nature of the Service's flycatcher subspecies designation. Most notably, Zink (2017) revealed critically misleading elements of Theimer et al. (2016), a preferred genetic study of the Service. Zink (2017), *supra* at 64–66.

**Denial of the Petition**

64.     In December 2017, the Service denied the Petition, and determined that the southwestern willow flycatcher is a distinct subspecies and should remain on the federal list of threatened and endangered species. *See* 82 Fed. Reg. 61,725 (Dec. 29, 2017).

65.     Addressing whether the flycatcher is a subspecies, the Service cited to several conflicting definitions of "subspecies," conceded that "[v]arious definitions or descriptions of subspecies exist," and noted that "[c]ontroversy over the utility and definition of subspecies has a long history." U.S. Fish & Wildlife Serv., 12 Month Finding on a Petition to Delist the

---

[1] As noted in Cattle Growers' 60-day Notice of Intent to Sue, although Zink's letter was published in the 2016 volume of The Open Ornithology Journal, it was made available to the Service in final form on January 5, 2017. U.S. Fish & Wildlife Serv., 12 Month Finding on a Petition to Delist the Southwestern Willow Flycatcher Under the Endangered Species Act and 5-Year Review, Fed. Doc. No. FWS-R2-ES-2016-0039-0024, at 7 (Dec. 28, 2017). As such, the Finding & Status Review refers to this letter as "Zink's 2017 letter." *Id*. In order to avoid confusion, this Complaint will continue to refer to this letter as Zink (2017), despite its 2016 publication date.

Southwestern Willow Flycatcher Under the Endangered Species Act and 5-Year Review, Fed. Doc. No. FWS-R2-ES-2016-0039-0024, at 9 (Dec. 28, 2017) [hereafter "Finding & Status Review"].

66.     In denying the Petition, the only standard for subspecies determinations announced by the Service was that "[t]he differences between subspecies are usually less distinct than the differences between species." *Id*.

67.     Although the Service identified certain "differences" between the "southwestern" willow flycatcher and other willow flycatcher populations, the Service provided no rule for gauging the significance of those purported "differences." *Id.* at 10–24.

68.     In its Final Rule denying the Petition, the Service assessed several studies. One study which played a critical role in the Service's final decision to maintain the flycatcher's listing was Theimer et al. (2016). *See* Finding & Status Review at 17–21, 23–24 (citing Tad C. Theimer et al., *Available Data Support Protection of the Southwestern Willow Flycatcher Under the Endangered Species Act*, 118 The Condor 289, 296 (2016)).

69.     Of the other available studies, the Service gave significant attention to Zink (2015) but refused to engage Zink (2017). *See* Finding & Status Review at 7.

70.     Zink (2017) provides three key pieces of additional data that directly contradicted the Service's position and highlighted critically misleading aspects of the Service's preferred study, Theimer et al. (2016).

71.     Documents produced from the Service's response to a FOIA request reveal that one of the Service's own avian experts recommended, to no effect, that the Finding & Status Review engage with Zink (2017). *See* Email from Gjon Hazard, Fish & Wildlife Biologist, U.S. Fish & Wildlife Serv., to Angela Picco et al. (May 9, 2017, 5:04 PM PDT) ("There is one topic I would

like to elaborate on . . . [Z]ink's rebuttal (Zink 2016, The Open Ornithology Journal 9(1):60–69) to the Theimer et al. (2016) critique of Zink (2015) is not presented in the document. . . . It seems to me that the Service should acknowledge and include this document in our evaluation, given that it is available and that Zink (2015) and Theimer et al. (2016) play such a central role to the petition and our response.").

72.     However, when provided with the contradictory information presented in Zink (2017), the Service refused to provide it the necessary attention. *See* Finding & Status Review at 7.

## DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

73.     Cattle Growers incorporates herein by reference the allegations set forth in the preceding paragraphs.

74.     Individual members of Cattle Growers have been injured by the Final Rule denying the Petition. By denying the Petition, the Service leaves intact the flycatcher's listing and critical habitat designation. If an injunction does not issue against the Service's Final Rule, these Cattle Growers members will be irreparably harmed. Harms attributable to the flycatcher's listing and subsequent critical habitat designation include, but are not limited to, devaluation of their property and the continued imposition of significant regulatory burdens on their property. A delisting of the flycatcher would result in the immediate rescission of the critical habitat designation, which would remedy the economic and other land-use-related injuries suffered by Cattle Growers' flycatcher-habitat-affected members.

75.     Cattle Growers has no plain, speedy, and adequate remedy at law for these injuries. Damages in this case are not available.

76.     Cattle Growers' claims for relief are ripe.

77.     If not enjoined by this Court, the Service's decision to deny the Petition without reference to any cognizable subspecies standard, in violation of fundamental administrative law principles, will be left unremedied, in derogation of Cattle Growers' rights and interests.

78.     If not enjoined by this Court, the Service's decision to deny the Petition without considering relevant evidence, in violation of fundamental administrative law principles, will be left unremedied, in derogation of Cattle Growers' rights and interests.

79.     An actual and substantial controversy exists between Cattle Growers and the Service over the latter's duty to comply with the ESA and the APA in ruling on Cattle Growers' Petition.

80.     This case is currently justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Cattle Growers' members. Because the listing of the flycatcher has devalued the property of Cattle Growers' members and continues to impose substantial regulatory burdens upon them, Cattle Growers has a keen interest in knowing whether the denial of its Petition to delist the flycatcher is legal.

81.     Therefore, declaratory and injunctive relief is appropriate to resolve this controversy.

**FIRST CLAIM FOR RELIEF**
*Failure to Articulate "Subspecies" Standard*
**(ESA, 16 U.S.C. §§ 1533(b)(3)(B), 1540(g)(1)(C))**

82.     Cattle Growers incorporates herein by reference the allegations set forth in the preceding paragraphs.

83.     An agency's articulation of a standard to guide its decision-making is essential to reasoned administrative decision-making. This rule derives from the requirement that an agency

identify a rational connection between the facts found and the decision made. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

84.     The Endangered Species Act authorizes the Service to list "subspecies." *See* 16 U.S.C. § 1532(16). However, the statute does not define the term, and the term does not have a commonly accepted meaning among taxonomists. Thus, for the Service to determine whether to list or to delist a "subspecies," it must itself decide upon a standard or definition for the term.

85.     The Service has not adopted a generally applicable definition of "subspecies."

86.     In denying the Petition, the Service accepted certain studies and rejected others. *See* Finding & Status Review at 9–24.

87.     In doing so, it set forth what it considers to be relevant types of data and methods for making a taxonomic determination. However, merely identifying and discussing pertinent data and methodology do not define what is to be established by that data and methodology.

88.     The Service did not articulate any standard or definition for what constitutes an avian subspecies. Necessarily, then, the Service could not and did not explain why the morphological, genetic, or other data before it support the conclusion that the southwestern willow flycatcher is a subspecies.

89.     This failure to explain renders the Service's decision arbitrary and capricious for three reasons:

> a.  First, a certain degree of statistically significant difference can be detected between nearly any randomly divided population of a particular species. Hence, without a standard to qualify the taxonomic significance of such distinctions, the Service illegally reserves to itself the unfettered discretion to designate any population as a subspecies, on a case-by-case and standardless basis. *See Trafalgar Cap. Assocs.,*

*Inc. v. Cuomo*, 159 F.3d 21, 34 n.11 (1st Cir. 1998) (an "ad-hoc standardless determination . . . is likely to be arbitrary and capricious"); Rob Roy Ramey II, *On The Origin of Specious Species*, *in* Institutions and Incentives in Regulatory Science 77, 83 (Jason Scott Johnston ed., 2012) ("If species concepts and definitions can be selected post hoc to fit any set of observations, then just about any group of organisms could potentially qualify (or not qualify) as a species depending on the investigator's whim or regulatory agency's bias.").

b. Second, the Service's failure to articulate a clear, publicly available and scientifically defensible standard for when it is appropriate to list a subspecies allows it to "move the goalpost," as it will always be able to alter the level of significance necessary to prove or disprove subspecies status. *Cf. Qwest Corp. v. FCC*, 689 F.3d 1214, 1228 (10th Cir. 2012) ("[A]n agency's shifting of the policy goalpost . . . may lead us to conclude that the agency has acted arbitrarily or capriciously."). This arrangement prevents the public from developing the necessary data to support a delisting petition. *Cf. Kunkel v. Comm'r*, 821 F.3d 908, 910 (7th Cir. 2016) ("[Y]ou can't beat something with nothing."). As such, in reaching its decision, the Service provided the public with no criterion to measure the soundness of its action or to alert them to the relevant taxonomic standards. The result is that the regulated public remains in the dark as to what constitutes a "subspecies," and the Service's decision-making process is hidden from public scrutiny.

c. Third, by reaching a conclusion without setting forth an adequate explanation for how the conclusion was reached, the Service made a listing decision without

observing the principle of reasoned agency decision-making. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[T]he agency must explain why it decided to act as it did. The agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action.") (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)). All agencies—including the Service—must satisfactorily explain their actions. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

90.     Compounding this arbitrariness, whatever de facto standard that the Service may have employed to diagnose the subspecies, the result was a taxonomic judgment that functioned only at the population, rather than the individual, level. In its Finding & Status Review, the Service admitted that its designation acknowledges an "intergradation" zone between the purported "southwestern" subspecies (*E. t. extimus*) and the purported "Great Basin" subspecies (*E. t. adastus*). Finding & Status Review at 17; *see also* 60 Fed. Reg. at 10,710–10,711. Within that zone, there is no way to identify individual birds as belonging to one or the other "subspecies." Upholding the flycatcher's subspecies status despite this intergradation zone is particularly problematic given that the Act's prohibitions operate on the individual, not the population, level. *Cf.* Michael A. Patten & Philip Unitt, *Diagnosability Versus Mean Differences of Sage Sparrow Subspecies*, 119 The Auk 26, 28 (2002) ("A valid subspecies should be diagnosably different from all other populations, not merely exhibit mean differences. Otherwise, individuals cannot be identified, predictability is lost, and the category is deprived of its most useful applications."). Indeed, given the substantial civil and criminal penalties attendant upon violations of the ESA's prohibition on take, due process compels the Service to employ a subspecies definition that allows for diagnosability at the individual level.

91.     Therefore, the Service's denial of Cattle Growers' delisting Petition was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the ESA, 16 U.S.C. §§ 1533(b)(3)(B), 1540(g)(1)(C).

## SECOND CLAIM FOR RELIEF
### *Failure to Articulate "Subspecies" Standard*
### **(In the Alternative to the First Claim for Relief)**
### **(APA, 5 U.S.C. § 706(2)(A))**

92.     Cattle Growers incorporates herein by reference the allegations set forth in the preceding paragraphs.

93.     The APA provides for review of final agency action when there is no other adequate judicial remedy. 5 U.S.C. § 704. To the extent that the First Claim for Relief is not cognizable as an ESA citizen suit action, the same is fully re-alleged under the APA.

94.     The Service's failure to articulate a standard or definition for "subspecies," and failure to explain why the data before the agency supported the designation of the flycatcher as a subspecies, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## THIRD CLAIM FOR RELIEF
### *Failure to Consider Relevant Evidence and to use the Best Available Data*
### **(ESA, 16 U.S.C. §§ 1533(b)(1)(A), (b)(3)(B), 1540(g)(1)(C))**

95.     Cattle Growers incorporates herein by reference the allegations set forth in the preceding paragraphs.

96.     An agency's consideration of all relevant evidence to guide its decision-making is essential to reasoned administrative decision-making. *See Butte County v. Hogen*, 613 F.3d at 194.

97.     Further, listing decisions under the Endangered Species Act must be made "solely on the basis of the best scientific and commercial data available . . . ." 16 U.S.C. § 1533(b)(1)(A).

98.     In affirming the flycatcher's dubious subspecies classification, the Service failed to consider relevant and available scientific evidence.

99.     The two main studies questioning the flycatcher's subspecies designation are Zink (2015) and Zink (2017). Although Zink (2015) received significant attention from the Service, Zink (2017) received almost none. The Service characterized Zink (2017) as not presenting new data and therefore ignored it. *See* Finding & Status Review at 7.

100.    However, contrary to the Service's characterization, Zink (2017) contains key new data that directly contradicts both the Service's position and important aspects of Theimer et al. (2016), a study that formed the backbone of the Service's decision to deny the Petition. *See* Finding & Status Review at 17–21, 23–24.

      a.  First, Zink (2017) supplies the phylogenetic analysis discussed but not included in Zink (2015). Zink (2017) *supra* at 63–64. That analysis shows that, by analyzing all publicly available mitochondrial DNA (mtDNA) data across the flycatcher species, "there is no support for *E. t. extimus*, or any other subspecies." *Id*. at 64. Moreover, Zink (2017) points out the fundamental flaw in prior flycatcher genetic analyses—the failure to recognize that mtDNA haplotypes are inherited as a unit. Hence, analyzing only a subset of the haplotypes—as the Service's preferred genetic studies did—is not adequate to detect subspecies structure: other subsets of the same genetic data may indicate conflicting patterns of variation. *Id*. at 63.

      b.  Second, Zink (2017) supplies a discriminant analysis[2] of all six color characters for the flycatcher. *Id.* at 66. Theimer et al. (2016), a study relied on heavily by the

_____

[2] William R. Klecka, *Discriminant Analysis* 7 (1980) ("Discriminant analysis is a statistical technique which allows the researcher to study the differences between two or more groups of objects with respect to several variables simultaneously.").

Service, argues for subspecies designation based on just one such character. *See* Theimer et al. (2016), *supra* at 296. But Zink (2017) points out the focus on just one character is inadequate because it might lead to conflicting subspecies diagnoses based on conflicting patterns of variation. Zink (2017), *supra* at 65. Zink (2017) in fact demonstrates that, after taking into account all available color characters, no subspecies structure can be discerned. *Id*. at 65–66.

c. Third, Zink (2017) reveals a critically misleading aspect of Theimer et al. (2016). The latter provides a figure of the mtDNA data, purporting to show the flycatcher's gene tree for four haplotypes *but without an overlay of existing subspecies divisions*. Zink (2017), however, shows the haplotypes with that overlay, thereby revealing that "none of the main groups map onto subspecies." *Id*. at 64.

101.     Under the fundamental administrative law rule of "substantial evidence," "an agency cannot ignore evidence contradicting its position," and a "refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action." *Butte County v. Hogen*, 613 F.3d at 194.

102.     Denial of the Petition without considering the key information in Zink (2017) constitutes unreasoned decision-making and is arbitrary and capricious.

103.     Additionally, by ignoring the key new evidence provided by Zink (2017), the Service failed in its duty to make its decision on the "basis of the best scientific and commercial data available . . . ." 16 U.S.C. § 1533(b)(1)(A). Indeed, the Service's own avian expert characterized Zink (2017) as playing a "central role" in the Petition and the Service's response. Email from Gjon Hazard, Fish & Wildlife Biologist, U.S. Fish & Wildlife Serv., to Angela Picco et al. (May 9, 2017, 5:04 PM PDT).

104.     Therefore, the Service's denial of Cattle Growers' delisting Petition was arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law, in violation of the ESA, 16 U.S.C. §§ 1533(b)(1)(A), (b)(3)(B), 1540(g)(1)(C).

**FOURTH CLAIM FOR RELIEF**
***Failure to Consider Relevant Evidence***
**(In the Alternative to the Third Claim for Relief)**
**(APA, 5 U.S.C. § 706(2)(A))**

105.     Cattle Growers incorporates herein by reference the allegations set forth in the preceding paragraphs.

106.     The APA provides for review of final agency action when there is no other adequate judicial remedy. 5 U.S.C. § 704. To the extent that the Third Claim for Relief is not cognizable as an ESA citizen suit action, the same is fully re-alleged under the APA.

107.     The Service's failure to consider relevant evidence and the best available scientific data was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests the following relief:

**As to the First Claim for Relief:**

1.     Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they denied Plaintiff's Petition without identifying or articulating a definition of "subspecies," in violation of the ESA, 16 U.S.C. §§ 1533(b)(3)(B), 1540(g)(1)(C).

**As to the Second Claim for Relief (stated in the alternative to the First Claim for Relief):**

2.     Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they denied Plaintiff's Petition without

identifying or articulating a definition of "subspecies," in violation of the APA, 5 U.S.C. § 706(2)(A).

**As to the Third Claim for Relief:**

3.      Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they denied Plaintiff's Petition without consideration of relevant evidence or the best available scientific data, in violation of the ESA, 16 U.S.C. §§ 1533(b)(1)(A), (b)(3)(B), 1540(g)(1)(C).

**As to the Fourth Claim for Relief (stated in the alternative to the Third Claim for Relief):**

4.      Declare that the Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they denied Plaintiff's Petition without consideration of relevant evidence or the best available scientific data, in violation of the APA, 5 U.S.C. § 706(2)(A).

**As to all Claims for Relief:**

5.      Set aside the Final Rule denying the Petition or enjoin its enforcement.

6.      Remand the Final Rule for Defendant to (i) articulate a generally applicable definition of subspecies, and (ii) determine whether the flycatcher satisfies that definition, taking into account all relevant evidence.

7.      Award Plaintiff reasonable attorney fees and costs, pursuant to 16 U.S.C. § 1540(g)(4), 28 U.S.C. § 2412, or any other appropriate authority; and

8.    Award Plaintiff any other relief the Court deems just and proper under the circumstances of this case.

DATED: December 13, 2021.

Respectfully submitted,

/s/Damien M. Schiff_____
DAMIEN M. SCHIFF, D.D.C. No. CA00045
CHARLES T. YATES, Cal. Bar No. 327704*
Email: dschiff@pacificlegal.org
Email: cyates@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

*Pro hac vice pending*

*Attorneys for Plaintiff New Mexico*
*Cattle Growers' Association*