# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW MEXICO CATTLE GROWERS' ASSOCIATION, | |
| Plaintiff, | No. 1:21-cv-3263-ACR |
| v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | |
| Federal Defendants, | |
| CENTER FOR BIOLOGICAL DIVERSITY and MARICOPA AUDUBON SOCIETY, | |
| Intervenor-Defendants. | |

**PLAINTIFFS' COMBINED REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' AND DEFENDANT INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

   I.  The Service's failure to articulate any standard to falsify its hypothesis that the
      southwestern willow flycatcher is a subspecies was arbitrary and capricious.......................3

     A.  Cattle Growers' arguments are not directed towards the Service's factual
         conclusions but to a logically prior legal question ...............................................5

     B.  Cattle Growers has not called upon this Court to resolve dueling propositions
         of biology and the Service is not entitled to deference .......................................7

     C.  That the Service must provide adequate definitional content for its taxonomic
         decision-making is fundamental to the reasoned decision-making required
         by the ESA and APA .........................................................................................10

        1.  The requirement that the Service set forth a non-arbitrary standard to govern
           its decision-making comes from the APA and the case law applying the APA ........11

        2.  Under these fundamental principles of reasoned decision-making, any such
           standard must allow for falsification ..........................................................16

  II.  The Service's failure to consider Zink (2017) in its decision to deny the Petition
      was arbitrary and capricious ...........................................................................23

     A.  The Service did not consider Zink (2017), as evidenced by its plainly wrong
         characterization of that study .........................................................................24

     B.  The Service's justifications for its failure to consider Zink (2017) are unavailing..........27

        1.  The Service's "no new original data" rationale is a post hoc rationalization,
           and in any event is an arbitrary justification given the Service's extensive
           treatment of Zink (2015) and Theimer *et al.* (2016) ......................................27

        2.  The Service's timing justification for treating Zink (2017) differently is at
           best a post hoc rationalization and at worst an implied concession that
           Zink (2017) merited consideration ..............................................................30

CONCLUSION..................................................................................................................32

CERTIFICATE OF SERVICE ...............................................................................................33

# TABLE OF AUTHORITIES

## Cases

*Am. Forest Res. Council v. Ashe*,
  946 F. Supp. 2d 1 (D.D.C. 2013) ...................................................................5, 7–8

*Am. Wildlands v. Kempthorne*,
  530 F.3d 991 (D.C. Cir. 2008) ...........................................................................6, 8

*Amoco Prod. Co. v. Watson*,
  410 F.3d 722 (D.C. Cir. 2005),
  *aff'd sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) ...........................10

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................4

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
  247 F.3d 1241 (D.C. Cir. 2001) .......................................................................7, 27

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ........................................................................................11, 22

*Butte County v. Hogen*,
  613 F.3d 190 (D.C. Cir. 2010) ...................................................................2, 24–25

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023), *pet. for cert. filed* 22-976 (U.S. Apr. 6, 2023) .....................9–10

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc*.,
  467 U.S. 837 (1984) .................................................................................................9

*Colo. River Cutthroat Trout v. Salazar*,
  898 F. Supp. 2d 191 (D.D.C. 2012) .......................................................................7

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ..............................................................................25

*Consumer Fed'n of Am. v. U.S. Dep't of Health & Human Servs.*,
  83 F.3d 1497 (D.C. Cir. 1996) .......................................................................28, 31

*Ctr. for Biological Diversity v. Badgley*,
  335 F.3d 1097 (9th Cir. 2003) ................................................................................7

*Defs. of Wildlife v. Babbitt*,
  958 F. Supp. 670 (D.D.C. 1997) .......................................................25, 27–28, 31

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) .................................................................29

*Epsilon Elecs., Inc. v. United States Dep't of Treasury*,
857 F.3d 913 (D.C. Cir. 2017) ..........................................................28, 31

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) ................................................................7

*Good Samaritan Hosp. v. Shalala*,
508 U.S. 402 (1993) ..................................................................................9

*In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*,
709 F.3d 1 (D.C. Cir. 2013) ...............................................................4, 14

*Jacobellis v. Ohio*,
378 U.S. 184 (1964) ......................................................................2, 12, 23

*Kunkel v. Comm'r*,
821 F.3d 908 (7th Cir. 2016) .............................................................22–23

*Loper Bright Enterprises v. Raimondo*,
143 S. Ct. 2429 (2023) .............................................................................9

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................................5, 7–8

*Mass. ex rel. Div. of Marine Fisheries v. Daley*,
170 F.3d 23 (1st Cir. 1999) ....................................................................23

*McDonnell v. United States*,
579 U.S. 550 (2016) ..........................................................................15, 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .........................................................................10–12, 22

*New York v. United States*,
342 U.S. 882 (1951) ................................................................................22

**Pac. Nw. Newspaper Guild, Loc. 82 v. Nat'l Labor Relations Bd.*,
877 F.2d 998 (D.C. Cir. 1989) .......................................................1, 13, 23

*PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*,
438 F.3d 1184 (D.C. Cir. 2006) .............................................................14

**Pearson v. Shalala*,
164 F.3d 650 (D.C. Cir. 1999) ..............................2, 11–14, 16–17, 20, 23

iii

*Pennsylvania v. Surface Transp. Bd.*,
    290 F.3d 522 (3d Cir. 2002)................................................................................13

*Sackett v. EPA*,
    143 S. Ct. 1322 (2023)..................................................................................10, 15, 21

*Safari Club Int'l v. Zinke*,
    878 F.3d 316 (D.C. Cir. 2017)...........................................................................9

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*,
    789 F.2d 26 (D.C. Cir. 1986)...........................................................................22

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)....................................................................................28, 31

*Sierra Club v. Salazar*,
    177 F. Supp. 3d 512 (D.D.C. 2016)..................................................................22, 29

*Skilling v. United States*,
    561 U.S. 358 (2010)....................................................................................10

*Transcon. Gas Pipe Line Corp. v. FERC*,
    54 F.3d 893 (D.C. Cir. 1995)...........................................................................22

*United States v. Menasche*,
    348 U.S. 528 (1955)....................................................................................10

**Statutes**

5 U.S.C. § 702................................................................................................4

5 U.S.C. § 704................................................................................................4

5 U.S.C. § 706(2)(A) (1994)...............................................................................11

5 U.S.C. § 706(2)(A).......................................................................................22

16 U.S.C. § 1532(6)..........................................................................................7

16 U.S.C. § 1532(16)....................................................................................2, 10

16 U.S.C. § 1532(20).........................................................................................7

16 U.S.C. § 1533(a)(1).......................................................................................7

16 U.S.C. § 1533(b)(1)(A)...................................................................................5

16 U.S.C. § 1533(e)(A).....................................................................................21

16 U.S.C. § 1533(f) ...................................................................................................7

16 U.S.C. § 1538 ......................................................................................................21

16 U.S.C. § 1540(a) ..................................................................................................15

16 U.S.C. § 1540(b) ............................................................................................10, 15

16 U.S.C. § 1540(g) ....................................................................................................3

21 U.S.C. § 343(r)(3)(B)(i) .......................................................................................11

21 U.S.C. § 343(r)(5)(D) ..........................................................................................11

## Regulations

21 C.F.R. § 101.14(c) (1998) .............................................................................11–12

50 C.F.R. § 17.11 ......................................................................................................21

50 C.F.R. § 424.11(a) ................................................................................................13

## Other Authorities

61 Fed. Reg. 4722 (Feb. 7, 1996) ..................................................................7, 14–15

## INTRODUCTION

Plaintiff New Mexico Cattle Growers' Association (Cattle Growers) offers the following combined reply memorandum in support of its Motion for Summary Judgment, ECF No. 25, and memorandum of points and authorities in opposition to Federal Defendants' (collectively the "Service") and Defendant-Intervenors' (Intervenors) Cross-Motions for Summary Judgment, ECF Nos. 26, 28.[1]  Cattle Growers is entitled to judgment as a matter of law because the Service's denial of Cattle Growers' Petition to delist the southwestern willow flycatcher, *see* FWS000714–757 (Petition), was illegal, for two independent reasons.

*First,* the Service's failure to articulate any standard to falsify the hypothesis that the southwestern willow flycatcher is a subspecies, was arbitrary and capricious, violating fundamental principles of reasoned decision-making.  *See* CG Op. Br. 29–39.  The Service and Intervenors respond by advancing an interpretation of the Endangered Species Act (ESA) that would delegate broad authority to the Service to apply the term "subspecies" on an ad hoc and standardless basis, subject only to the evidentiary requirement of "best available science."  *See* Serv. Br. 1, 20–22; Int. Br. 15–16.  But avoiding "impermissible 'ad hocery' . . . is the core concern underlying the prohibition of arbitrary or capricious agency action."  *Pac. Nw. Newspaper Guild, Loc. 82 v. Nat'l Labor Relations Bd.*, 877 F.2d 998, 1003 (D.C. Cir. 1989). The Service's limitless interpretation—and corresponding failure to articulate a standard to falsify the hypothesis that the southwestern willow flycatcher is a "subspecies" eligible for ESA

---

[1] Cattle Growers will hereafter refer to its Memorandum of Points and Authorities in Support of Summary Judgment, ECF No. 25-1, as "Cattle Growers' Opening Brief" (CG Op. Br.); Federal Defendants' Memorandum of Points and Authorities, ECF Nos. 26-1 and 27, as the "Service's Brief" (Serv. Br.); and Defendant-Intervenor's Memorandum of Points and Authorities, ECF Nos. 28-1, 29, as "Intervenors' Brief" (Int. Br.).  Citations to each brief refer to the internal pagination, not the ECF pagination.

listing—runs headlong into this fundamental principle of reasoned decision-making.  The

Service must "giv[e] some definitional content," *Pearson v. Shalala*, 164 F.3d 650, 660 (D.C.

Cir. 1999), to the term "subspecies," 16 U.S.C. § 1532(16), because for an agency "[t]o refuse to

define the criteria it is applying is equivalent to simply saying no without explanation," *Pearson*,

164 F.3d at 660.  The Service and Intervenors' "best available science" defense therefore misses

the point.  Whatever the types of evidence or the methods for collecting evidence that the Service

prefers, the agency still must select a rule or standard to apply to that evidence in order to

determine whether the flycatcher qualifies as a subspecies under the ESA.  And to make it

"possible for the regulated class to perceive the principles which are guiding agency action," *id.*

at 661, that rule or standard must allow for falsification of the Service's subspecies hypothesis—

the Service cannot proceed according to a rule that would enable it to inevitably produce an

affirmative subspecies conclusion.  This Court should reject the Service's "I know it when I see

it," *id.* at 660 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring)),

interpretation of the ESA.

  **Second,** by refusing to engage with Zink (2017), the Service ignored relevant, new, and

available evidence, again violating the fundamental administrative law principle of reasoned

decision-making.  *See* CG Op. Br. 39–44.  According to this principle, an agency's "refusal to

consider evidence bearing on the issue before it constitutes arbitrary agency action."  *Butte*

*County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).  Contrary to the Service and Intervenors'

arguments, the Service's terse conclusion that Zink (2017) contains "no new information," *see*

Serv. Br. 37, 42 (citing FWS000791); Int. Br. 20 (same), does not demonstrate that Zink (2017)

was adequately considered.  Indeed, the demonstrably false nature of that proposition betrays the

Service's outright failure to consider Zink (2017).  The Service's attempts to rehabilitate its

insufficient treatment of Zink (2017) via a series of post hoc rationalizations and arbitrary justifications, *see* Serv. Br. 39–43, are similarly unavailing.

For these reasons, which are discussed further below, and for the reasons set forth in Cattle Growers' Opening Brief, this Court should grant Cattle Growers' Motion for Summary Judgment, ECF No. 25; deny the Service and Intervenors' Cross-Motions for Summary Judgment, ECF Nos. 26, 28; vacate the Service's denial of Cattle Growers' Petition; and remand the matter for the Service to determine—considering all relevant evidence—whether, under a clearly articulated and non-arbitrary standard, the flycatcher constitutes a separate subspecies, and thus whether the Service should initiate rulemaking to delist the bird.[2]

## ARGUMENT

### I.   The Service's failure to articulate any standard to falsify its hypothesis that the southwestern willow flycatcher is a subspecies was arbitrary and capricious

This Court should grant summary judgment in Cattle Growers' favor on its First, or alternatively, its Second Claim for Relief, because the Service's failure to articulate any standard to falsify the hypothesis that the southwestern willow flycatcher is a subspecies was arbitrary and capricious. *See* CG Op. Br. 29–39.

The Service argues initially that Cattle Growers' First Claim for Relief is not cognizable under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), because "Section 4 does not impose a nondiscretionary duty to articulate a definition or standard for identifying a subspecies." *See* Serv. Br. 23–24.  Cattle Growers contends that, by failing to articulate any standard to falsify the hypothesis that the southwestern willow flycatcher is a subspecies, the Service violated its mandatory duty to issue a finding on Cattle Growers' Petition in a manner that accords with the

---

[2] To satisfy LCvR 7(h)(2), Cattle Growers hereby incorporates its Statement of Facts from its Opening Brief, CG Op. Br. 9–18, into this opposition.

fundamental principles and procedures of reasoned decision-making that govern the Service's conduct—namely, that it cannot act in an arbitrary and capricious manner.  *See* CG Br. 29–36.  The Service does not have the discretion to disregard these fundamental principles of reasoned decision-making when acting pursuant to Section 4 of the ESA.  *See In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig*., 709 F.3d 1, 8 (D.C. Cir. 2013) ("This [arbitrary and capricious] standard applies to our review of ESA listing decisions.").  *Cf. Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.").  In any event, the Service does not raise a similar jurisdictional objection to this Court's resolution of Cattle Growers' Second Claim for Relief.  *See* Serv. Br. 23–24 (declining to argue that Cattle Growers' Second Claim for Relief should be dismissed on jurisdictional grounds).  And it could not.  If Cattle Growers cannot pursue its claim under the ESA's citizen suit provision, it may do so pursuant to the Administrative Procedure Act (APA).  *See* 5 U.S.C. §§ 702, 704.  *See also Bennett*, 520 U.S. at 161–62 ("[T]he APA by its terms independently authorizes review . . . when 'there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)); ECF No. 1, ¶ 93 (CG Compl.) ("To the extent that the First Claim for Relief is not cognizable as an ESA citizen suit action, the same is fully re-alleged under the APA.").  This Court must—at the very least—reach the merits of Cattle Growers' Second Claim for Relief.

On the merits, the Service and Intervenors advance an interpretation of the ESA that would delegate broad authority to the Service to apply the term "subspecies" on an ad hoc and standardless basis, subject only to the evidentiary requirement of "best available science."  *See* Serv. Br. 1, 20–22; Int. Br. 15–16.  This limitless interpretation—and the Service's

corresponding failure to articulate a standard to falsify its willow flycatcher subspecies

hypothesis—cannot be sustained, for three reasons.  First, the Service and Intervenors' argument

that the Service is required to use only the best scientific data available, 16 U.S.C.

§ 1533(b)(1)(A), which the Service and Intervenors allege the Service to have done, *see* Serv Br.

20–22; Int. Br. 15–20, 24, 26, is not responsive to Cattle Growers' legal critique.  Second,

contrary to the Service and Intervenors' arguments, Serv. Br. 21–22, 32 (quoting *Marsh v. Or.*

*Nat. Res. Council*, 490 U.S. 360, 378 (1989)); Int. Br. 19 (quoting *Am. Forest Res. Council v.*

*Ashe*, 946 F. Supp. 2d 1, 15 (D.D.C. 2013)), the Service's boundless interpretation of the ESA is

not entitled to deference.  And third, the Service and Intervenors' argument that the ESA and

APA do not impose a standard-articulation requirement upon the Service, *see* Serv. Br. 25–33;

Int. Br. 23–24, ignores axioms of reasoned decision-making.  Under these fundamental

principles—which govern the conduct of all federal agencies—the Service's taxonomic decision-

making must proceed according to a standard by which the regulated public can falsify any

subspecies hypothesis announced by the Service.

### A.    Cattle Growers' arguments are not directed towards the Service's factual conclusions but to a logically prior legal question

The Service and Intervenors principally defend the Service's standardless denial of Cattle

Growers' Petition on the ground that the Service purportedly relied upon the "best available

scientific data" in concluding that the southwestern willow flycatcher is a distinct subspecies.

*See* Serv. Br. 20–22, 26–29, 33; Int. Br. 15–20, 23–24, 26.  The Service and Intervenors' best

available science defense attacks a straw man.  Cattle Growers' argument is not directed to the

Service's evidentiary choices but to a logically prior legal question:  the rule or standard (or lack

thereof) which is supposed to operate on the data derived from the Service's evidentiary choices.

*See* CG Op. Br. 33–36.  Cattle Growers argues that, by failing to articulate a non-arbitrary rule or

standard for what constitutes a willow flycatcher subspecies, the Service had no way to rationally evaluate the best available science in the record in a manner that satisfies the APA's prohibition on arbitrary agency action.  *See* CG Op. Br. 29–36.

This distinction is critical.  Whether the Service wishes to use only genetic evidence, or only morphological evidence, or some combination of the two, or other types of evidence, does not answer the essential question: *what must the evidence show*?  Put another way, if one were to ask, "what is the definition of negligence?", the answer would not be "hearsay," even though the evidentiary rules of hearsay undoubtedly affect whether a negligence tort can be proved.  In the same way it misses the point to say, in response to the question, "what is the definition of subspecies generally, or at least as applied to the flycatcher?", that "the best available data have been used."  By arguing that the Service had no obligation set forth an affirmative standard for diagnosing willow flycatcher subspecies beyond reliance upon the evidentiary requirement of "best available scientific data," the Service and Intervenors put the cart before the horse.  The command to consider the best available science cannot supply a non-arbitrary standard for the Service's taxonomic decision-making because that command merely identifies the relevant evidence upon which any subspecies standard will operate.

For this reason, the Service and Intervenors' reliance on case law that gives the evidentiary edge to the Service in science-based challenges to its decision-making is misplaced.  Indeed, if anything that case law supports Cattle Growers' position because it presupposes that the Service (or the ESA itself) has resolved the logically prior question and articulated the relevant standard or definition, before the agency's evaluation of the facts in the record.  *See, e.g.*, *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008) (upholding the Service's determination that the westslope cutthroat trout was not threatened, which is a statutorily defined

term, *see* 16 U.S.C. § 1532(20), for which the ESA provides a list of factors to be considered, *see id*. § 1533(a)(1)); *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (upholding the Service's decision to list various fairy shrimp species as endangered or threatened, which are statutorily defined terms, *see* 16 U.S.C. § 1532(6), (20), and for which the ESA provides a list of factors to be considered); *Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097, 1100–01 (9th Cir. 2003) (upholding a determination that the Northern goshawk is not endangered or threatened, which are statutorily defined terms for which the ESA provides a list of factors to be considered); *Am. Forest Res. Council*, 946 F. Supp. 2d at 9–20 (upholding Service's decision not to delist a distinct population segment (DPS) of the marbled murrelet as consistent with the Service's standards for listing DPS, as set forth in its DPS policy, 61 Fed. Reg. 4722, 4722 (Feb. 7, 1996)); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 196 (D.D.C. 2012) (upholding a determination that the Colorado River cutthroat trout is not endangered or threatened, which are statutorily defined terms for which the ESA provides a list of factors to be considered); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105–15 (D.D.C. 1995) (upholding recovery plan developed for the grizzly bear as consistent with the statutory guidelines for recovery plans, 16 U.S.C. § 1533(f), and the Service's own comprehensive policy and guidelines for recovery plans).

> **B.    Cattle Growers has not called upon this Court to resolve dueling propositions of biology and the Service is not entitled to deference**

The Service and Intervenors make much of the heightened deference afforded agency expertise "[w]hen specialists express conflicting views[,]" Serv. Br. 21–22, 32 (quoting *Marsh*, 490 U.S. at 378), asking this Court to defer to the Service's interpretation of the ESA as delegating it broad authority to apply the term "subspecies" on an ad hoc and standardless basis,

subject only to the evidentiary requirement of best available science.  *See* Serv. Br. 1, 20–22; Int. Br. 15–16.  This plea for deference is misplaced, for three reasons.

*First*, while it is true that agencies receive heightened deference in resolving "issues of fact," courts distinguish between factual disputes involving agency technical determinations, on the one hand, and disputes "turn[ing] on the meaning of" a disputed statutory term "or on an application of" a statutory standard "to settled facts," on the other.  *Marsh*, 490 U.S. at 376–77.  In other words, courts need not defer to agency technical expertise when addressing legal questions that are logically prior to the technical, factual, or evidentiary choices made by an agency.  *Cf. id.*  In this case, Cattle Growers challenges the Service's application of the statutory term "subspecies," as found in the ESA, to the facts in the record pertaining to the flycatcher's status.  *See* CG Op. Br. 29–36.  Specifically, Cattle Growers argues that, by failing to first set forth a non-arbitrary standard for what constitutes a willow flycatcher "subspecies" for purposes of the ESA, the Service could not rationally evaluate the studies in the record which speak to that question—regardless of any evidentiary choices made, or technical expertise possessed, by the agency.  *See id.*

*Second*, the Service and Intervenors are simply wrong to argue that the Service is entitled to deference because Cattle Growers has called upon this Court to "direct the agency in a choice between rational alternatives," Serv. Br. 22 (quoting *Am. Wildlands*, 530 F.3d at 1000), or "evaluate . . . dueling propositions of biology," Int. Br. 19 (quoting *Am. Forest Res. Council*, 946 F. Supp. 2d at 15).  Cattle Growers has done nothing of the sort.  Cattle Growers makes no request for this Court to direct the Service in a choice between any of the studies in the record—

be that Zink (2015), or some other study.[3]  Instead, Cattle Growers asks this Court to remand the

matter *for the Service* to make such choices, after first articulating a rational and non-arbitrary

standard for evaluating the studies in the record.  *See* CG Op. Br. 45.  *See also* ECF No. 25 at 2

(CG MSJ).  In other words, Cattle Growers asks this Court to address the overarching legal

framework within which the Service is to marshal its technical expertise to evaluate the "dueling

propositions" of biology in the record.  This is well within the Court's competence.

    ***Third***, while it is true that—at least for now[4]—an agency's reasonable construction of

ambiguous language found in a statute that it administers is entitled to deference, *see Safari Club*

*Int'l v. Zinke*, 878 F.3d 316, 326 (D.C. Cir. 2017) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def.*

*Council, Inc*., 467 U.S. 837, 842 (1984)), the Service's interpretation of the ESA as delegating it

broad authority to apply the term "subspecies" on an ad hoc and standardless basis, subject only

to the evidentiary requirement of best available science, is entitled to no deference.  No

deference is afforded an ad hoc interpretation, one which varies according to agency decision.

*See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993).  And under the rule of lenity,

"*Chevron* does not apply" where "the statutory language at issue implicates criminal penalties,"

*Cargill v. Garland*, 57 F.4th 447, 468 (5th Cir. 2023), *pet. for cert. filed* 22-976 (U.S. Apr. 6,

---

[3] Intervenors, for their part, go so far as to characterize Cattle Growers' "arguments [as] focus[ing] primarily on the Service's treatment of Dr. Zink—the Cattle Growers' preferred scientist—and attempt[ing] to elevate his opinions over the broader body of scientific analyses confirming the southwestern willow flycatcher's status as a valid subspecies."  Int. Br. 1.  *See also* Int. Br. 16.  Intervenors miss the point entirely.  This litigation is not a contest of Zink (2015) contra mundum.  Cattle Growers' First and Second Claims for relief focus solely on the legal question of whether the Service, in this discrete action, has used a *standard* for subspecies designation that is arbitrary and capricious.  *See* CG Op. Br. 29–39.  To the extent that the Service's treatment of Zink (2015) is relevant to Cattle Growers' First and Second Claims for Relief, it is only that, by failing to set forth a non-arbitrary standard for what constitutes a willow flycatcher subspecies, the Service precluded a rational adjudication of the conflicts between Zink (2015) and the other studies in the record.  *See* CG Op. Br. 32–33.

[4] *Cf. Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429, 2429 (2023).

2023) (collecting cases), as the ESA's grant of authority to list "subspecies" does, *see* 16 U.S.C. § 1540(b).  *Cf. Sackett v. EPA*, 143 S. Ct. 1322, 1342 (2023) ("Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities, we have been wary about going beyond what 'Congress certainly intended the statute to cover.'" (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010))).  In any event—and as discussed further in the following section—the Service's interpretation of the ESA is patently *unreasonable* because it violates fundamental principles of reasoned decision-making.[5]

### C.   That the Service must provide adequate definitional content for its taxonomic decision-making is fundamental to the reasoned decision-making required by the ESA and APA

The Service and Intervenors argue that Cattle Growers—in its contention that the Service must set forth a standard by which one could falsify the agency's flycatcher subspecies hypothesis—is impermissibly foisting additional procedures onto the Service's decision-making. *See* Serv. Br. 25–33; Int. Br. 23–24.  But the rule that the Service must say what it means by "subspecies" when determining that the flycatcher is a subspecies comes not from Cattle Growers.  It derives from a fundamental principle of reasoned decision-making that applies to all agencies—namely, the requirement that an agency identify a "rational connection between the

---

[5] Additionally, the Service and Intervenors' interpretation of the ESA as delegating to the Service boundless authority to apply the term "subspecies" on an ad hoc and standardless basis, subject only to the evidentiary requirement of best available science, *see* Serv. Br. 1, 20–22; Int. Br. 15–16, should be rejected because it would render the ESA's grant of authority to list "distinct population segment[s]" of species, *see* 16 U.S.C. § 1532(16), superfluous.  Under the Service and Intervenors' construction of the ESA, the power to list "subspecies" would entirely subsume the power to list "distinct population segment[s]."  *Cf. Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005), *aff'd sub nom. BP Am. Prod. Co. v. Burton*, 549 U.S. 84 (2006) ("It is a familiar canon of statutory construction that, 'if possible,' we are to construe a statute so as to give effect to 'every clause and word.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))).  If the power to list "subspecies" is as broad as the Service and Intervenors allege, one is left to wonder why Congress saw it necessary to amend the ESA in 1979 to create additional listable entities—namely, distinct population segments—below the species level.

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The Service's denial of Cattle Growers' Petition does not satisfy this fundamental requirement because: (1) the District of Columbia Circuit has made clear that agency decision-making cannot proceed in an arbitrary, ad hoc, or standardless manner; and (2) the standards purportedly articulated by the Service in denying Cattle Growers' Petition prove not to be standards at all, because they do not allow the regulated public to falsify the Service's southwestern willow flycatcher subspecies hypothesis.

1.   **The requirement that the Service set forth a non-arbitrary standard to govern its decision-making comes from the APA and the case law applying the APA**

For an agency "[t]o refuse to define the criteria it is applying is equivalent to simply saying no without explanation," which is impermissible. *Pearson*, 164 F.3d at 660–61. This prohibition on unexplained agency action comes not from Cattle Growers, but rather is "squarely rooted in the prohibition under the APA that an agency not engage in arbitrary and capricious action." *Id.* (citing 5 U.S.C. § 706(2)(A) (1994)).

In *Pearson*, appellants—marketers of certain dietary supplements—challenged an order from the United States Food and Drug Administration declining to preapprove health claims to be displayed on supplement product labels. *Pearson*, 164 F.3d at 651. The governing statute authorized FDA to preapprove such health claims upon a certification that there exists "significant scientific agreement" as to the claims, *id.* at 653 (quoting 21 U.S.C. § 343(r)(3)(B)(i)), but it delegated authority to FDA to flesh out the standard and procedures for certification, *id.* (citing 21 U.S.C. § 343(r)(5)(D)). FDA promulgated a regulation by which it would certify health claims if it found "'significant scientific agreement' among experts that the claim is supported by the available evidence." *Id.* at 651–52 (citing 21 C.F.R. § 101.14(c)

(1998)).  FDA declined to preapprove appellants' health claims under this "significant scientific agreement" standard, "conclud[ing] that the evidence was inconclusive for one reason or another and thus failed to give rise to 'significant scientific agreement.'"  *Id.* at 653.  But "FDA never explained just how it measured 'significant' or otherwise defined the phrase."  *Id.* at 653–54.  The District of Columbia Circuit held that this "[u]narticulated [s]tandard" violated the APA.  *Id.* at 660–61.  In the Court's view, the fundamental requirement that agency action be adequately explained "necessarily implies giving some definitional content to the phrase 'significant scientific agreement,'" *id.* at 660, and FDA's "I know it when I see it" approach, *id.* (quoting *Jacobellis*, 378 U.S. at 197 (Stewart, J., concurring)), was arbitrary and capricious.  "It simply will not do for a government agency to declare—without explanation—that a proposed course of private action is not approved," *id.* (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)), because "[t]o refuse to define the criteria it is applying is equivalent to simply saying no without explanation," *id.*

The Service's rejection of Cattle Growers' Petition suffers from the very same defect.  The Service and Intervenors contend that the Service is not required to articulate a standard by which one could falsify the Service's southwestern willow flycatcher subspecies hypothesis, pointing only to (i) the Service's purported reliance on the "best available science," *see* Serv. Br. 26–27; Int. Br. 15–20, 24, 26; (ii) a vague regulation that authorizes the Service to make subspecies determinations by "rely[ing] on standard taxonomic distinctions and the biological expertise of the Department and the scientific community" concerning the relevant taxonomic group, *see* Serv. Br. 26–27 (quoting 50 C.F.R. § 424.11(a)); Int. Br. 23 (same); and (iii) the purported scientific uncertainty surrounding the meaning of the term "subspecies," *see* Serv. Br. 27–28 & n.10; Int. Br. 26, 29–30.  But just as the APA prohibited FDA's reliance upon an

unarticulated "significant scientific agreement" standard, *Pearson*, 164 F.3d at 660, the Service cannot rely upon unexplained notions of the "biological expertise of the Department and the scientific community," *see* 50 C.F.R. § 424.11(a), when listing subspecies.

The Service and Intervenors argue that Cattle Growers supports its general proposition that the APA prohibits agencies from engaging in standardless decision-making by citing cases that can be distinguished factually. *See* Serv. Br. 30–31; Int. Br. 25–26. The Service and Intervenors also complain that Cattle Growers cites dicta to support its argument. *See* Serv. Br. 30–31; Int. Br. 25–26. But regardless of the precise contours of the fact patterns arising in the cases cited by Cattle Growers, they each stand for a clear and unassailable proposition: avoiding "impermissible 'ad hocery' . . . is the core concern underlying the prohibition of arbitrary or capricious agency action." *Pac. Nw. Newspaper Guild, Loc. 82*, 877 F.2d at 1003. *See also Pennsylvania v. Surface Transp. Bd.*, 290 F.3d 522, 535 (3d Cir. 2002) ("[A]gencies must apply consistent standards and principles to insure the fairness of the administrative process."). Indeed, the Service and Intervenors cite no authority for the proposition that the Service's taxonomic decision-making is somehow exempt from this foundational administrative law principle.

The Service and Intervenors also object that requiring the agency to state what it means by "subspecies" in accordance with this basic principle would hamstring the agency's decision-making by preventing case-by-case determinations—arguing that case-by-case determinations are in fact permissible under the APA. *See* Serv. Br. 26–27, 32; Int. Br. 23–24, 30. Nothing in Cattle Growers' argument would preclude the Service from developing its taxonomic rules through individual listing determinations, so long as the resulting standards were applied consistently and any variation in application were justified by legitimate scientific principle. *See* CG Op. Br. 29–39. But, whether the adjudicatory-like process of producing such a standard is

gradual or sudden, the agency must still articulate the standard in such a manner that renders it "possible for the regulated class to perceive the principles which are guiding agency action." *Pearson*, 164 F.3d at 661.  *See also PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("an agency proceeding on a case-by-case basis must pour 'some definitional content' into a vague statutory term by 'defining the criteria it is applying.'" (quoting *Pearson*, 164 F.3d at 660)).  The Service has not done so here.  That failure distinguishes this case from one in which the Service, while acknowledging that standards may evolve depending on the species at issue, *had* articulated a standard or definition.  *See In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*, 709 F.3d at 14–16 (upholding the Service's interpretation of "likely" to mean "the word's ordinary definition" and the agency's interpretation of "foreseeable" to mean "a 45-year period").

The Service also contends that the fact that it has chosen to promulgate a generalized standard for listing "distinct population segments," 61 Fed. Reg. at 4722, while declining to do the same for "subspecies," is of no moment, because "the terms 'subspecies' and 'distinct population segment' are different[,]" Serv. Br. 31–32.  Whereas "'subspecies' is a recognized term in taxonomy and biology . . . the term 'distinct population segment' is a legislative invention not derived from or already established in science."  *Id.*  That may be true, but it is a distinction without a difference.  Just as "it is important that the term 'distinct population segment' be interpreted in a clear and consistent fashion" because "[a]vailable scientific information provides little specific enlightenment in interpreting the phrase," 61 Fed. Reg. at 4722, it is important that the term "subspecies" be interpreted in a clear and consistent fashion because there is "no universally accepted subspecies definition within or across taxa," FWS014315 (Haig *et al.* 2006).  *I.e.*, "[a]vailable scientific information" likewise "provides little

14

specific enlightenment in interpreting," 61 Fed. Reg. at 4722, the term "subspecies."  The term "distinct population segment" may have no meaning outside the ESA.  But the term "subspecies" is subject to such discord that it likewise has no settled meaning outside of the statute.  *See* CG Op. Br. 6–7.  Importantly, the Service is not an academic body engaged in pure scientific investigation—it is a regulatory agency that must administer a law that imposes significant civil and criminal penalties.  16 U.S.C. § 1540(a)–(b).  It cannot fall back on academic debate over the meaning of a *scientific* term to excuse its arbitrary conduct in the application of a *statutory* term.  *Cf. Sackett*, 143 S. Ct. at 1342 ("Due process requires Congress to define penal statutes 'with sufficient definiteness that ordinary people can understand what conduct is prohibited' and 'in a manner that does not encourage arbitrary and discriminatory enforcement.'"  (quoting *McDonnell v. United States*, 579 U.S. 550, 576 (2016))).  In any event, the Service and Intervenors seemingly make the mistake of confusing normal scientific debate over how best to answer a question, with an epistemological debate about whether a question is answerable.  *See* Serv. Br. 27–28 & n.10; Int. Br. 4–5, 29–30.  The debate in the literature is over what the best standard for subspecies diagnosis is, *not* whether it is logically or scientifically possible to have such a standard.  *Cf.* FWS020347 (Zink 2015) (summarizing the scientific debate over subspecies definitions (citing Barrowclough (1982)); FWS016331–333 (Remsen (2010)) (considering the various levels of diagnosability that have been proffered, from seventy-five to one hundred percent).  Put another way: virtually everyone agrees that "subspecies" means something—the debate is simply over which meaning is best. Fundamental principles of administrative law require the Service to answer that question, cognizant of the regulatory not academic context within which the agency operates.

### 2. Under these fundamental principles of reasoned decision-making, any such standard must allow for falsification

The Service and Intervenors do ultimately make some concession to Cattle Growers' critique of the agency's standard-less decision-making, for they each advance various purported standards which were supposedly applied in denying Cattle Growers' Petition. For its part, the Service toggles between a justification based on the alleged "weight of the evidence" supporting the flycatcher's subspecies taxonomy, Serv. Br. 2, 17, 31, and an argument that, in diagnosing the flycatcher as a subspecies, the agency "look[ed] for 'non-clinal geographic variation' or 'a step cline' . . . in willow flycatcher genetics, behavior, and morphology[,]" Serv. Br. 9, 29. The Intervenors, for their part, focus primarily on the purported "weight of the evidence" and "broader body" of literature supporting the flycatcher's subspecies taxonomy. *See* Int. Br. 1, 15–17, 22, 26–27. But the prohibition on arbitrary and capricious agency action requires that it "be possible for the regulated class to perceive the principles which are guiding agency action." *Pearson*, 164 F.3d at 660–61. The Service's approach to the southwestern willow flycatcher's taxonomy does not meet this core requirement of rationality, because it does not allow for falsification of its subspecies hypothesis. *See* CG Op. Br. 29–36. That deficiency is fatal to the Service's defense because any standard that precludes falsification is no standard at all, and thus would impermissibly allow the Service to inevitably produce an affirmative subspecies conclusion in every case. Neither the "weight of the evidence" standard advanced by the Service and Intervenors, nor the "non-clinal geographic variation" standard advanced by the Service, satisfies the minimum standards of rationality required by the APA.

***First***, as to the purported "weight of the evidence" supporting the southwestern willow flycatcher's subspecies taxonomy, this defense is non-responsive to Cattle Growers' critique because it relies upon an evaluation of the "best available science," without first defining a

standard to operate upon that "best available science." *See supra* at 5–7.  Moreover, any

"counting academic heads" theory of subspecies designation is inherently arbitrary.  There is no

support in the literature for affirming that a subspecies is valid merely because it is affirmed by a

majority of taxonomists.  There is, to be sure, disagreement in the literature as to what constitutes

a subspecies, but the literature presumes that each author's competing definition will be at least

generally (if not universally) applicable.  *Cf.* FWS020347 (Zink 2015) (summarizing the

scientific debate over subspecies definitions (citing Barrowclough (1982)); FWS016331–333

(Remsen (2010)) (considering the various levels of diagnosability that have been proffered, from

seventy-five to one hundred percent).  What matters for purposes of APA review is the *reason*

for the Service's subspecies conclusion.  The conclusion that a majority of taxonomists would

affirm a designation, while a minority would not—each based upon application of a competing

standard—is no valid reason at all.  *Cf. Pearson*, 164 F.3d at 660–61 (rejecting agency's reliance

on an unvarnished "significant scientific agreement" standard).

  **Second**, as to the Service's purported reliance on "non-clinal geographic variation' or 'a

step cline' . . . in willow flycatcher genetics, behavior, and morphology[,]" Serv. Br. 29—any

such standard is inherently non-falsifiable.  The Service does not contend otherwise.  It points to

nothing in the record to support the view that one could falsify its flycatcher subspecies-

hypothesis that a subspecies is valid because of mere population-level statistical significance.[6]

*See* Serv. Br. 29–30 (declining to dispute Cattle Growers' core contention that statistically

significant non-clinal geographic variation could be found between any two randomly divided

populations of willow flycatcher and instead citing case law on the "best available science"

---

[6] Instead, it characterizes Cattle Growers' critique as a mere "policy" disagreement.  *See* Serv.
Br. 29–30.  But the only policy that Cattle Growers relies upon is the APA's policy against
arbitrary decision-making.

standard and arguing the Service alone should be the final arbiter of whether such differences are *significant enough* to warrant listing a population as a subspecies).[7]  Nor could it.  As Cattle Growers argues in its Opening Brief, the evidence in the record demonstrates that a standard based on "non-clinal geographic variation," or mere population-level statistical significance, provides no means to falsify the Service's subspecies hypothesis.  *See* Op. Br. 32–35.  *See also* FWS016331 (Remsen 2010) ("Given large enough sample sizes, the means of any two populations likely differ significantly (>95%), even though actual overlap can be nearly complete, and so statistically significant differences in the means alone provide almost no information on how distinctive two populations are in terms of diagnosability, the key theme of the conceptual definitions of subspecies."); FWS016332 (Remsen 2010) ("A persistent criticism of the subspecies concept is that analysis of different characters may produce different subdivisions . . . . In other words, the characters are not distributed in a concordant geographic manner . . . ."); FWS020347 (Zink (2015) ("Probably all populations differ in some respect from other populations.  For example, an individual in one area might have an allele that is found nowhere else, or there might be an individual that is larger and darker-colored than any other individual in the species.").

Indeed, this problem is demonstrated aptly by the disagreement between Theimer *et al.* (2016), *see* FWS018104–115, and Zink (2017), *see* FWS020357–366, which each analyzed either narrow (Theimer *et al.* (2016)) or broad (Zink (2017)) subsets of the southwestern willow flycatcher's genetic and morphological data, and came to markedly different conclusions

---

[7] Intervenors, for their part, appear to celebrate the inability of the regulated public to falsify the Service's flycatcher subspecies hypothesis.  *Cf.* Int. Br. 29 ("Armed with such a standard, the Cattle Growers and Dr. Zink could further their crusade to delist the southwestern willow flycatcher and any other avian subspecies they oppose . . . .").

regarding non-clinal geographic variation, *see* CG Op. Br. 41–42 (discussing the differing analysis and conclusions in Zink (2017) and Theimer *et al.* (2016)).

This problem with a standard based only upon "non-clinal geographic variation," Serv. Br. 29, is likewise demonstrated by the studies relied upon by the Service to support its flycatcher determination, many of which looked for non-clinal geographic variation with respect to the putative flycatcher subspecies as historically defined—thus validating rather than testing variation in the existing putative flycatcher subspecies.  For example, Unitt (1987) undertook to comparatively analyze character variation in willow flycatcher populations but did so with respect only to existing subspecies limits.  FWS018138–143 (Unitt 1987)).  Sedgwick (2001)'s vocalization analysis, FWS017248–262, looked to a "reduced set of song characters"—including those characters which separated *E. t. trailli* from *E. t. adastus*, while excluding those characters showing a different pattern.  *See* FWS020348 (Zink (2015)) (summarizing Sedgwick (2001)'s methodology).  Sedgwick (2001) also admitted of a "sampling gap" which happened to "correspond[] to the geographic division in song features" thus "reducing the potential to detect gradation in song characteristics between areas."  FWS020348.  Similarly, Paxton *et al.* (2008) and Paxton *et al.* (2010)'s sample sites excluded seventy-five percent of the range of *E. t. adastus*, and fifty percent of the range of *E. t. extimus*.  FWS020349 (Zink (2015)) (summarizing Paxton *et al.* (2008) and Paxton *et al.* (2010)).  And in relying upon morphological (coloration) data derived from core areas within the putative subspecies, Paxton *et al.* (2010) stated explicitly that, "[b]ecause this study was intended to distinguish among *established taxonomic units*, we grouped breeding sites *a priori* into one of the four subspecies based on geographic ranges delineated via morphological studies. . . ."  FWS020348 (Zink (2015)) (emphasis added) (quoting Paxton *et al.* (2010) (emphases added)).  *See also* FWS000800 (Finding) (summarizing

Paxton *et al.* (2010)).  Each of these studies found statistically significant non-clinal geographic variation among the putative subspecies as historically defined, but such an outcome was inevitable based on their methodology.  *Cf.* FWS020348–349 (Zink (2015)) (critiquing the studying the flycatcher's taxonomy with reference only to a priori subspecies limits).  The confirmatory nature of these studies demonstrates the inherent flaw in the Service's proffered "non-clinal geographic variation," Serv. Br. 29, standard—its manipulability permits for no falsification.

This inability on the part of regulated public to falsify the Service's hypothesis is fatal to the Service's proffered standard.  A standard which does not allow for falsification is no standard at all.  It is merely a pseudo-standard, because its application would produce overlapping and conflicting subspecies, the selection among which would be a purely arbitrary exercise.  *See* CG Op. Br. 33–35.  If an agency's proffered standard offers no way for the regulated public to falsify the agency's conclusions, the regulated public has no way to "perceive the principles which are guiding agency action." *Pearson*, 164 F.3d at 660–61.  *Cf. id.* at 661 ("Accordingly, on remand, the FDA must explain what it means by significant scientific agreement or, at minimum, *what it does not mean*."  (emphasis added)).

The Service and Intervenors' critique of Cattle Growers' "parade of horribles," Serv. Br. 33–35; Int. Br. 28, is off-base for similar reasons.  The point is not that all of these horribles will necessarily materialize, but the mere fact that they are possible illustrates the conflict between the Service's non-falsifiable subspecies standard and fundamental principles of reasoned decision-making.  *Cf.* CG Op. Br. 36, 38. Indeed, the Service and Intervenors admit that the agency's approach to subspecies diagnosis has here resulted in a region of intergradation where members of the regulated public have absolutely no way to discern whether they are subject to

20

civil and potentially criminal penalties for violating the ESA.  *See* Serv. Br. 11, 29; Int. Br. 18. This is not, as the Service argues, merely a question of potentially "misidentified" willow flycatchers.  Serv. Br. 34.  Rather, it is a question of the Service's non-clinal geographic variation "standard" being able to affirm only mean differences occurring at the *population level*, *cf. supra* at 18, thus precluding any reliable *individual* diagnosis.  This is a serious defect, given that the ESA's prohibitions operate at the individual, not the population, level, *see* 16 U.S.C. § 1538, and because the southwestern willow flycatcher is protected under the ESA "wherever found," 50 C.F.R. § 17.11.  The Service's approach thus renders it impossible for the regulated public—within a certain region of the country—to *ever* know whether a diminutive songbird pertains to the "southwestern" population of the willow flycatcher or instead to another, unprotected, willow flycatcher population.  *See* CG Op. Br. 36–37.  "Due process requires Congress to define penal statutes 'with sufficient definiteness that ordinary people can understand what conduct is prohibited' and 'in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Sackett*, 143 S. Ct. at 1342 (quoting *McDonnell*, 579 U.S. at 576). By advancing a non-falsifiable standard for delineating willow flycatcher subpopulations into either protected or unprotected classes, the Service runs headlong into this principle of due process.[8]  At the very least, this standardless mode of decision-making evinces arbitrary and capricious agency conduct.

---

[8] Intervenors suggest that these due process problems could be avoided by the Service protecting additional sub-populations of the 9,100,000, FWS020358 (Zink 2017) (citing Partners in Flight), willow flycatchers in North America, pursuant to the ESA's section 4(e) "similarity of appearance" authority.  Int. Br. 28–29 (citing 16 U.S.C. § 1533(e)(A)).  This defense begs the question.  It presumes that the Service can first identify—in a non-arbitrary manner—what constitutes a true southwestern willow flycatcher, such that it could conclude that other sub-populations are similar enough to warrant listing pursuant to 16 U.S.C. § 1533(e)(A)).  Such a defense is unresponsive to Cattle Growers' critique that, under the Service's standardless

Moreover, as Cattle Growers argues in its Opening Brief, *see* CG Op. Br. 31–32, the requirement that the Service employ falsifiable standards is a necessary correlate of the APA's judicial review provisions, which presuppose that agency action can be determined to be arbitrary. *See* 5 U.S.C. § 706(2)(A). If an agency were to exercise its discretion in a manner intrinsically immune from arbitrary and capricious review—by, for example, proceeding on the basis of a standard which does not permit the courts or regulated public to falsify its conclusions—it would thwart the very purpose of the APA. *Cf. Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) ("As to transparency, the agency 'must, of course, reveal the reasoning that underlies its conclusion' [and] '*give the court* the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves.'" (quoting respectively *Transcon. Gas Pipe Line Corp. v. FERC*, 54 F.3d 893, 898 (D.C. Cir. 1995), and *San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n*, 789 F.2d 26, 48 (D.C. Cir. 1986)) (emphasis added)). *Cf. also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48 ("Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion." (quoting *Burlington Truck Lines*, 371 U.S. at 167 (quoting *New York v. United States*, 342 U.S. 882, 884 (1951) (Douglas, J., dissenting)) (emphasis in original; quotation marks omitted)); *id.* ("We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner[.]"); *Kunkel v. Comm'r*, 821 F.3d 908, 910 (7th Cir. 2016) ("[Y]ou can't beat

---

approach, one cannot reliably determine whether any individual is a southwestern willow flycatcher, or whether the southwestern willow flycatcher is even a distinct entity.

something with nothing."); *Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("If no one propose[s] anything better, then what is available is the best.").

* * *

The Service and Intervenors advance an interpretation of the ESA that would delegate to the Service extraordinary power to apply the term "subspecies" on an ad hoc basis, with reference to no standard beyond the evidentiary requirement of the best available science.  But avoiding such "impermissible 'ad hocery' . . . is the core concern underlying the prohibition of arbitrary or capricious agency action."  *Pac. Nw. Newspaper Guild, Loc. 82*, 877 F.2d at 1003. Under this fundamental principle of reasoned decision-making, the Service must "giv[e] some definitional content" to the term subspecies, because for an agency "[t]o refuse to define the criteria it is applying is equivalent to simply saying no without explanation."  *Pearson*, 164 F.3d at 660.  And to make it "possible for the regulated class to perceive the principles which are guiding agency action," *id.* at 661, any such standard must permit falsification of the Service's flycatcher hypothesis—the Service cannot proceed according to a rule that would enable it inevitably to produce of an affirmative subspecies conclusion.  This Court must reject the Service's "I know it when I see it," *id.* at 660 (quoting *Jacobellis*, 378 U.S. at 197 (Stewart, J., concurring), interpretation of the ESA, and grant summary judgment in Cattle Growers' favor on its First, or alternatively, its Second Claim for Relief.  ECF No. 1, ¶¶ 82–94 (CG Compl.).

## II.   The Service's failure to consider Zink (2017) in its decision to deny the Petition was arbitrary and capricious

This Court should grant summary judgment in Cattle Growers' favor on its Third, or alternatively, its Fourth Claim for Relief.  By erroneously characterizing Zink (2017) as containing "no new information," the Service ignored relevant, novel, and available evidence, in violation of the fundamental administrative law principle of reasoned decision-making.  *See*

23

*Butte County*, 613 F.3d at 194.  The Service and Intervenors first defend that, under the ESA's requirement that the Service's decision-making be based only upon the best available science, Cattle Growers must demonstrate that Zink (2017) constitutes *better* science than that upon which the Service purportedly relied.  *See* Serv. Br. 36–38; Int. Br. 21.  Next, the Service attempts to rehabilitate its arbitrary denial of Cattle Growers' Petition by advancing a series of post hoc rationalizations and arbitrary justifications for its deficient treatment of Zink (2017).  *See* Serv. Br. 39–43.  These arguments cannot sustain the Service's failure to consider Zink (2017), for the reasons discussed below.

A. **The Service did not consider Zink (2017), as evidenced by its plainly wrong characterization of that study**

By ignoring Zink (2017) and thus failing to render any rational conclusion as to that study's contribution to the best available science, the Service acted arbitrarily and capriciously.  *See* CG Op. Br. 39–45.  The Service and Intervenors argue that, for Cattle Growers to assail the Service's denial of its Petition under the ESA's best available science standard, Cattle Growers must demonstrate that Zink (2017) constitutes *better* science than that upon which the Service purportedly relied.  *See* Serv. Br. 36–38; Int. Br. 21.  The Service and Intervenors thus respond to an argument that Cattle Growers has not made—namely, that Zink (2017) contains superior information such that it *should have changed* the Service's ultimate conclusion.  *See* Serv. Br. 39 (characterizing Cattle Growers' argument as an attack on the Service's refusal to "endorse" Zink (2017); Int. Br. 21 (characterizing Cattle Growers' argument as a complaint "[t]hat the Service ultimately did not agree with Zink (2017)").  Cattle Growers' argument does not turn on a finding that Zink (2017) per se renders the Service's denial of Cattle Growers' Petition invalid.  Rather, Cattle Growers contends that, as a relevant and available study assessing the southwestern willow flycatcher's subspecies taxonomy, Zink (2017) *could* contribute to the best

available science, such that in rendering a decision without considering it, the Service acted in an arbitrary and capricious manner.  *See* CG Op. Br. 39–44.  Cattle Growers' argument finds support in the rule that an agency's "refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action."  *Butte County*, 613 F.3d at 194.  This rule applies to the Service's decision-making under the ESA.  *See Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) ("In light of the ESA requirement that the agencies use the best scientific and commercial data available . . . the FWS *cannot ignore* available biological information (emphasis added; citation omitted)).  *See also* Int. Br. 20 (conceding that the rule that an agency acts arbitrarily and capriciously when it "refuse[s] to evaluate" relevant information presented to it, applies to the Service's decision-making under the ESA (quoting *Butte County*, 613 F.3d at 194)).  It might very well be that Zink (2017) is *not* the best available science—but on remand the Service must actually consider Zink (2017) to rationally so conclude.

The Service and Intervenors take the position that Zink (2017) was in fact considered, pointing to a terse statement in the Service's Finding that, because Zink (2017) contains "no new information," it "did not change [the Service's] evaluation."  Serv. Br. 37, 42 (citing FWS000791); Int. Br. 20 (same).  But this "dismissive and conclusory," *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 681 (D.D.C. 1997), evaluation of Zink (2017) does not pass muster under arbitrary and capricious review.  Indeed, the Service's demonstrably false characterization of Zink (2017) as containing "no new information"—a conclusion that is irreconcilable with the undisputed facts in the record—betrays the Service's failure to consider that study.

As Cattle Growers explained in its Opening Brief, the record demonstrates that Zink (2017) indisputably contains "new information" in at least three significant respects.  *See* CG Op. Br. 40–42.  *First*, Zink (2017) supplies the phylogenetic analysis discussed but not included in

Zink (2015) and points out the fundamental flaw in prior flycatcher genetic analyses—the failure

to recognize that mtDNA haplotypes are inherited *as a unit*, such that analyzing variation in only

*subsets* of haplotypes is necessarily inadequate to establish the *consistent* variation at an

individual and population level needed for subspecies diagnosis.  *See* FWS020360–361.  *Second*,

Zink (2017) supplies a discriminant analysis of all six color characters for the flycatcher, *see*

FWS020363, responding to Theimer *et al.* (2016)'s analysis based on just one such character, *see*

FWS018112 (Theimer *et al.* (2016)).  *Third*, Zink (2017) reveals a critically misleading aspect of

Theimer *et al.* (2016).  The latter provides a figure of the mtDNA data, purporting to show the

flycatcher's gene tree for four haplotypes *but without an overlay of existing subspecies divisions*.

FWS020361 (Zink (2017)).  Zink (2017), however, shows the haplotypes with that overlay,

thereby revealing that "none of the main groups map onto subspecies."  *Id.*  In short, Zink

(2017), utilized new analyses—specifically a phylogenetic analysis of *all* flycatcher mtDNA data

and a discriminant analysis of *all* flycatcher color data—to conclude that any purported

distinctions in willow flycatcher taxonomy are de minimis.  FWS020362–363 (Zink (2017)).

That determination necessarily undermined the Service's heavy reliance[9] on Theimer *et al.*

(2016)'s hybrid-zone analysis, which employed *a limited subset* of genetic data.  *See*

FWS000807–808 (Finding) (citing Theimer *et al.* (2016)).

      The Service's failure to acknowledge the indisputably new information in Zink (2017)

betrays its failure to consider that study.  The Service may not rely upon a demonstrably false

---

[9] The Service concedes that Theimer *et al.* (2016) was "central" to the Service's denial of Cattle
Growers' Petition.  *See* Serv. Br. 38 n.12.  This concession should give the Court pause in
entertaining the Service and Intervenors' various attempts to downplay the Service's reliance on
Theimer *et al.* (2016).  *See* Serv. Br. 40–43; Int. Br. 19, 22.  If, as the Service concedes, Theimer
*et al.* (2016), was "central" to the Service's resolution of Cattle Growers' Petition, then surely
the new information presented in Zink (2017)'s targeted rebuttal to Theimer *et al.* (2016),
warranted consideration.  *See* CG Op. Br. 42–44.

proposition to justify its conclusions as to the best available science. *Cf. Defs. of Wildlife*, 958 F. Supp. at 682 (finding that "significant factual errors [on the part of the Service [we]re clear indications that the agency's decisionmaking, based on glaringly faulty factual premises, was arbitrary and capricious and therefore must be set aside"); *Bldg. Indus. Ass'n of Superior Cal.*, 247 F.3d at 1246–47 ("The Service may not base its listings on speculation *or surmise* or disregard superior data . . . . (emphasis added)).

**B.     The Service's justifications for its failure to consider Zink (2017) are unavailing**

The Service attempts to rehabilitate its arbitrary denial of Cattle Growers' Petition by advancing two post hoc rationalizations for its deficient treatment of Zink (2017). Even if properly raised, these arguments do not excuse the Service's failure to adequately consider Zink (2017).

**1.     The Service's "no new original data" rationale is a post hoc rationalization, and in any event is an arbitrary justification given the Service's extensive treatment of Zink (2015) and Theimer *et al.* (2016)**

The Service contends that what it *actually* meant when it concluded that Zink (2017) "did not change" its evaluation because Zink (2017) contains no "new information," *see* FWS000791, was that Zink (2017) did not change its evaluation because Zink (2017) contains no new original data, *see* Serv. Br. 39–40. The Service did not, however, articulate this rationale for disposing of Zink (2017) in its Finding. This argument is therefore an improper post hoc rationalization.

It is true that the Service declared that "[n]o new original southwestern willow flycatcher data was collected, analyzed, and submitted during our request for information." FWS000791. And the Service did note that Zink (2017)—like Zink (2015) and Theimer *et al.* (2016)—did not collect any new original data. *Id*. But this was not the justification given by the Service for disposing of Zink (2017). Rather, the Service simply stated that, "[b]ecause there was *no new*

27

*information* in this letter, it did not change our evaluation." *Id.* (emphasis added).  As explained

above, the Service's "no new information" justification is clearly wrong and betrays the

Service's failure to consider Zink (2017).  *See supra* at 25–27.  The Service cannot now—for

purposes of this litigation—argue that what it actually meant by "[b]ecause there was *no new*

*information* in this letter, it did not change our evaluation," FWS000791 (emphasis added), was

"[b]ecause there was *no new information [based upon the collection of original raw data*] in this

letter, it did not change our evaluation," *cf.* Serv. Br. 39–40.  "It is well-established that this kind

of '*post hoc* rationalization' by an agency's lawyer cannot sustain a decision upon review."

*Defs. of Wildlife*, 958 F. Supp. at 681 (citing *Consumer Fed'n of Am. v. U.S. Dep't of Health &*

*Human Servs.*, 83 F.3d 1497, 1507 (D.C. Cir. 1996)).  *See also Epsilon Elecs., Inc. v. United*

*States Dep't of Treasury*, 857 F.3d 913, 925 (D.C. Cir. 2017) ("The grounds upon which an

administrative order must be judged are those upon which *the record* discloses that its action was

based." (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (emphasis in original))).

   In any event, even if properly raised on this record, the Service's rationale is arbitrary and

cannot sustain the Service's deficient treatment of Zink (2017).  As the Service notes, Zink

(2015) and Theimer *et al.* (2016), like Zink (2017), are not premised on the collection of new

original data, but rather analyze existing data.  *See* FWS000791 (Finding).  However, that fact

did not prevent the Service from "devot[ing] ten [out of seventeen total] pages to evaluating the

additional analyses and specific arguments in Zink (2015) and Theimer *et al.* (2016) together

with the studies that provided the original data for the two commentaries' analyses."  Serv. Br.

40.  If Zink (2017)'s lack of original data was such an impediment to its contribution to the best

available scientific data that summarily dismissing it was warranted, then Zink (2015) and

Theimer *et al.* (2016) should have been summarily dismissed for the same reason.  Yet, Zink

(2015) and (especially) Theimer *et al.* (2016) played a central role in the Service's denial of Cattle Growers' Petition.  *See* CG Op. Br. 42–43 (citing FWS000792, FWS000796, FWS000801–805, FWS000807–808).  The Service concedes this point.  *See* Serv. Br. 38 n.12. [10] The Service, however, explains nowhere in its Finding why it gave "central" treatment to Theimer *et al.* (2016) and Zink (2015), while summarily disposing of Zink (2017)—despite all three studies suffering from the same purported flaw.  *See* FWS000792–808.[11]  This unexplained and inconsistent treatment of Zink (2017), as compared to Theimer *et al.* (2016) and Zink (2015), is arbitrary and capricious.  *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) ("We have often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule."  (collecting cases)).  *Cf. Sierra Club v. Salazar*, 177 F. Supp. 3d at 540 (noting that an agency may not cite "favorable evidence and disregard[] unfavorable evidence").

Moreover, the Service cites no legal authority for the rule that information not premised on the collection of new raw data cannot contribute to the best available science.  *See* Serv. Br. 39–41.  Indeed, the record demonstrates that this is not the rule.  In its Finding, the Service repeatedly concluded that Theimer *et al.* (2016) contributed to the best available scientific data, despite that study's lack of new raw data.  *See* FWS000802 ("Zink's (2015, p. 5) conclusion that Paxton *et al.* (2007) graphed information incorrectly leading to invalid results was demonstrated

---

[10] As Cattle Growers notes in the alternative in its Opening Brief, the Service's own avian expert, Gjorn Hazard, pointed out that Zink (2015) and Theimer *et al.* (2016) "play . . . a central role to the petition and [the Service's] response."  CG Op. Br. 43 n.16 (quoting ECF No. 10, ¶ 103 (Serv. Ans.)).  The Service maintains that the Hazard Email is not part of the administrative record, but "does not dispute these assertions based on evidence in the record."  Serv. Br. 38 n.12 (citing FWS000791).

[11] As discussed further below, an explanation in the form of a post hoc rationalization—namely the time constraint the Service was acting under—now comes in this litigation.  *See infra* at 30–31.

by Theimer *et al.* (2016, p. 291) to be inaccurate."); FWS000805 ("We find that by addressing

concerns raised by Zink (2015, p. 8) and using methods specific to the evaluation of morphology,

clines, and hybrid zones, Theimer *et al.*'s (2016) additional analysis *added further rigor* to the

original plumage information collected by Paxton *et al.* (2010) *to contribute to the best available*

*information* that there are statistical differences in plumage coloration that are separated by the

subspecies geographic boundaries."  (emphases added)); FWS000807–808 ("Theimer *et al's*

(2016) HZAR analyses provided *compelling information* about step-clines associated with

willow flycatcher subspecies genetics and morphology (plumage)."  (emphasis added)).

> ### 2. The Service's timing justification for treating Zink (2017) differently is at best a post hoc rationalization and at worst an implied concession that Zink (2017) merited consideration

The Service did not explain its inconsistent treatment of Zink (2017), as compared to

Theimer *et al.* (2016) and Zink (2015), anywhere in its Finding.  *See supra* at 28–30.  An

explanation now comes in this litigation—in the form of an appeal to the time constraints that the

Service was laboring under in responding to Cattle Growers' Petition.  *See* Serv. Br. 41–42.  The

Service argues that it was unable to treat Zink (2017) in the same manner as Zink (2015) and

Theimer *et al.* (2016) because it received those studies much earlier than Zink (2017), and it was

acting under a statutorily mandated twelve-month deadline to respond to Cattle Growers'

Petition following issuance of its ninety-day finding.[12]  *See id.*  This argument is at best an

improper post hoc rationalization. At worst, it is an implied concession that Zink (2017) merited

consideration.

---

[12] A deadline which the Service failed to meet by some eight months anyhow.  *Compare* FWS000770 (90-day finding) (issued on March 16, 2016) *with* FWS000877 (12-month finding) (issued on December 29, 2017).

That the Service did not consider Zink (2017), because to do so would have jeopardized its ability to meet the statutorily required twelve-month deadline, is a justification that can be found nowhere in the Service's stated reasons for rejecting Zink (2017).  *See* FWS000791. Again, "[i]t is well-established that this kind of '*post hoc* rationalization' by an agency's lawyer cannot sustain a decision upon review."  *Defs. of Wildlife*, 958 F. Supp. at 681 (citing *Consumer Fed'n of Am.*, 83 F.3d at 1507).  *See also Epsilon Elecs., Inc.*, 857 F.3d at 925 ("The grounds upon which an administrative order must be judged are those upon which *the record* discloses that its action was based."  (quoting *Chenery Corp.*, 318 U.S. at 87 (emphasis in original))).

Even if this justification were properly raised, it is in direct tension with the Service's other arguments.  By contending that it ran out of time to consider Zink (2017), the Service implies that it would have given Zink (2017) the same treatment as Zink (2015) and Theimer *et al.* (2016) had it had the time to do so.  But if, as the Service argues elsewhere, Zink (2017) simply contained "no new information" such that it was entirely justified in its summary treatment of the study, *see* Serv. Br. 39–43, then any time constraint under which the Service was operating would have been of no moment.  The Service cannot have it both ways.  Zink (2017) either contains no new information such that the Service would have been justified in ignoring it regardless of time, or it does contain new information worthy of the Service's attention.  As discussed above and in Cattle Growers' Opening Brief, Zink (2017) indisputably contains new and relevant information.  *See supra* at 24–27; CG Op. Br. 40–42.

* * *

This Court should grant summary judgment in Cattle Growers' favor on its Third, or alternatively its Fourth, Claim for Relief, vacate the Service's denial of Cattle Growers' Petition, and remand the matter to the Service, for an assessment of whether the indisputably new

information in Zink (2017) contributes to the best available science on the southwestern willow flycatcher's taxonomy, and in turn whether, in light of that science, the Petition should be granted.

## CONCLUSION

In denying Cattle Growers' Petition, the Service violated the fundamental administrative law principle of reasoned decision-making.  In interpreting the ESA to deny Cattle Growers' Petition, the Service failed to set forth a standard for what constitutes a willow flycatcher "subspecies" that would allow for falsification of the hypothesis that the southwestern willow flycatcher is a distinct subspecies.  And it ignored relevant and available scientific evidence bearing on the flycatcher's subspecies designation.  This Court should therefore grant Cattle Growers' Motion for Summary Judgment; deny the Service and Intervenors' Cross-Motions for Summary Judgment; vacate the Service's denial of Cattle Growers' Petition; and remand the matter for the Service to determine—considering all relevant evidence—whether, under a clearly articulated and non-arbitrary standard, the flycatcher constitutes a separate subspecies, and thus whether the Service should initiate rulemaking to delist the bird.

DATED: August 29, 2023.

Respectfully submitted,

/s/ Damien M. Schiff
DAMIEN M. SCHIFF, D.D.C. No. CA00045
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: dschiff@pacificlegal.org

/s/ Charles T. Yates
CHARLES T. YATES, Cal. Bar No. 327704
*Pro hac vice*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: cyates@pacificlegal.org

*Attorneys for Plaintiff New Mexico Cattle Growers' Association*

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  All counsel of record is registered with the Court's CM/ECF system, and will receive a notification of such filing via the Court's electronic filing system.

/s/ Charles T. Yates
CHARLES T. YATES, Cal. Bar No. 327704
*Pro hac vice*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: cyates@pacificlegal.org